# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CD INTERNATIONAL ENTERPRISES, INC.<br>421 Fairway Drive, Suite 200<br>Deerfield Beach, FL 33441 | * <br> * <br> * | |
| *Plaintiff* | * <br> * | |
| versus | * <br> * | CIVIL ACTION |
| ROCKWELL CAPITAL PARTNERS, INC.<br>919 N. Market Street, Suite 1401<br>Wilmington DE 19801 | * <br> * <br> * <br> * | |
| ALPINE SECURITIES CORPORATION<br>39 Exchange Place<br>Salt Lake City, UT 84111 | * <br> * <br> * <br> * | |
| COLONIAL STOCK TRANSFER COMPANY, INC.<br>66 Exchange Place, Suite 100<br>Salt Lake City, UT 84111 | * <br> * <br> * <br> * | |
| MATHEAU J. W. STOUT<br>400 East Pratt Street<br>Baltimore, MD 21202 | * <br> * <br> * <br> * | NO. |
| SAMUEL OSHANA<br>520 Cognewaugh Road<br>Greenwich, CT 06807 | * <br> * <br> * <br> * | |
| and | * <br> * | |
| DEFENDANTS' RESPECTIVE INSURERS | * <br> * | |
| *Defendants* | * <br> * | JURY DEMANDED |

*************************************************************

1

ORIGINAL COMPLAINT
FOR DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201,
(i) DECLARING "DEATH-SPIRAL" CONVERTIBLE NOTE and
(ii) INSTRUCTIONS TO TRANSFER AGENT COLONIAL
ABSOLUTE NULLITIES *EX TURPI CAUSA* and
(iii) FOR DAMAGES FOR BREACH OF CONTRACT and
FOR WRONGFUL CONVERSION OF RESTRICTED SHARES;
(iv) FOR DAMAGES ARISING FROM VIOLATIONS OF
SECTIONS 5(a), 5(c) and 17(a) OF THE 1933 SECURITIES ACT,
and SECTIONS 10(b) and 12(b) OF THE 1934 SECURITIES ACT
and RULE10b-5 PROMULGATED THEREUNDER
and REQUEST FOR A TRIAL BY JURY

## I.   *ARTICLE III STANDING*[1]

1.      CD International Enterprises, Inc. ("CDII"), is a Florida-based public company trading under OTC symbol CDII with 1,000,000,000 shares of common stock authorized, of which 500,000,000 have been issued.

2.      This Complaint raises private and public policy issues as to "death-spiral" conversions by defendant Rockwell Capital Partners, Inc. ("Rockwell") of 220,000,000 shares of CDII common stock resulting in a precipitous drop in shareholder value in millions of dollars.

3.      The controversy in this § 2201 Declaratory Judgment Action includes (at least) the application of a conversion formula based on the market price of the subject stock on the date of conversion (not the date of issue), known as "death spiral convertibles" because holders of these toxic instruments profit when the market price is manipulated to remain low, resulting in conversions of a prohibitively-high number of shares, severely diluting the value of the common stock of CDII.

---

[1]      The Supreme Court has recognized third-party "standing" "...where it would be difficult or impossible for the persons whose rights are asserted to present their grievance before any court...", as with individual shareholders, <u>Barrows v. Jackson</u>, 346 U.S. 249 (1953).

4.     Death Spiral Convertibles, also known as "Floating-Price Convertibles" because the number of shares to be issued at conversion changes daily, (i) are a hallmark of manipulative selling, (ii) are inconsistent with the enforcement goals of the Securities and Exchange Commission ("SEC") to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation and (iii) frustrate efforts by the Financial Industry Regulatory Authority ("FINRA") to implement FINRA Rule 2010, FINRA Regulatory Notice 09-05 and the concept that Self-Regulatory Organizations ("SROs") exist to police the applicable industry and enhance integrity.

5.     In addition to the reason why the death-spiral formula applied in the case at bar makes the transaction null as to CDII, death-spiral convertibles are generally null and void as against public policy[2].

6.     The following chart exemplifies the shocking level of fraud and unjust enrichment resulting from the 2015 staccato sales by Rockwell of 220,000,000 shares of CDII Common Stock, expressed (i) in number of shares converted (ii) at unconscionable conversion rates, (iii) providing minimal credits to the CDII debt involved (iv) as opposed to sale proceeds collected by Rockwell and (v) the level of fraud in terms of dollars.

---

[2]     Q.V. Short Selling, Death Spiral Convertibles, and the Profitability of Stock Manipulation, John Finnerty, Fordham University Professor of Finance, at page 50:

> "FPCs allow the manipulator to cover his short position with conversion shares. The greater selling further reduces the firm's share price, which increases the manipulator's profit by increasing the number of shares converted shares at no additional cost....If the manipulator naked shorts....he can deliver the conversion shares [to cover the short]".

| DATE | SHARES | C-RATE | CREDIT | CLOSE | $ TO RCP | FRAUD[3] |
|------|--------|--------|--------|-------|----------|----------|
| 10/20 | 2,000,000 | 0.01260 | $ 25,200 | 0.0245 | $ 49,000 | $ 23,800 |
| 10/26 | 3,000,000 | 0.01020 | $ 30,600 | 0.0170 | $ 51,000 | $ 20,700 |
| 11/03 | 4,000,000 | 0.00246 | $ 9,840 | 0.0041 | $ 16,400 | $ 6,560 |
| 11/05 | 4,000,000 | 0.00180 | $ 7,200 | 0.0030 | $ 12,000 | $ 4,800 |
| 11/11 | 4,000,000 | 0.00120 | $ 4,800 | 0.0020 | $ 8,000 | $ 3,200 |
| 11/16 | 4,000,000 | 0.00120 | $ 4,800 | 0.0023 | $ 9,200 | $ 4,400 |
| 11/18 | 8,000,000 | 0.00108 | $ 8,640 | 0.0018 | $ 14,400 | $ 5,760 |
| 11/20 | 8,000,000 | 0.00084 | $ 6,720 | 0.0014 | $ 12,200 | $ 4,480 |
| 11/25 | 8,000,000 | 0.00084 | $ 6,720 | 0.0020 | $ 16,000 | $ 9,280 |
| 12/02 | 8,000,000 | 0.00084 | $ 6,720 | 0.0306 | $244,800 | $238,080 |
| 12/03 | 11,100,000 | 0.00078 | $ 8,658 | 0.0306 | $339,660 | $336,002 |
| 12/03 | 11,100,000 | 0.00078 | $ 8,658 | 0.0134 | $148,740 | $140,082 |
| 12/03 | 11,100,000 | 0.00078 | $ 8,658 | 0.0134 | $148,740 | $140,082 |
| 12/04 | 11,100,000 | 0.00078 | $ 8,658 | 0.0090 | $ 99,900 | $ 91,242 |
| 12/04 | 11,100,000 | 0.00078 | $ 8,658 | 0.0090 | $ 99,900 | $ 91,242 |
| 12/04 | 7,653,000 | 0.00078 | $ 5,969 | 0.0090 | $ 68,877 | $ 62,908 |
| 12/07 | 16,000,000 | 0.00078 | $ 12,480 | 0.0111 | $ 177,600 | $165,120 |
| 12/07 | 16,000,000 | 0.00078 | $ 12,480 | 0.0111 | $ 177,600 | $165,120 |
| 12/08 | 16,000,000 | 0.00078 | $ 12,480 | 0.0102 | $ 163,200 | $150,720 |
| 12/09 | 11,616,000 | 0.00078 | $ 9,060 | 0.0089 | $ 103,382 | $ 94,322 |
| 12/10 | 16,000,000 | 0.00078 | $ 12,480 | 0.0053 | $ 84,800 | $ 72,320 |
| 12/10 | 19,000,000 | 0.00078 | $ 14,820 | 0.0053 | $ 100,700 | $ 85,880 |

---

[3]     Because Rockwell was converting/selling immediately, the fraud is measured by the closing price on the day of conversion.  As the stock-price decreased, the level of fraud increased  -  a hallmark of death-spiral transactions.

| 12/11 | 9,231,000 | 0.00078 | $ 7,200 | 0.0062 | $ 57,232 | $ 50,032 |
| 12/15 | 7,051,000 | 0.00078 | $ 5,499 | 0.0056 | $ 39,485 | $ 33,986 |

7.     During the 3-day period from December 2 to 4, 2015, Rockwell processed seven (7) conversions for a total of 71,153,000 shares at $.00078, collected $ 1,150,617 from sales and kept $ 1,099,638.

8.     During the cited 6-week period, Rockwell collected $ 2,242,816, gave CDII only $ 247,000 in credits against the remaining balance, and is poised to convert additional shares in the absence of judicial intervention.

9.     The only *plausible* interpretation of the documents is that Rockwell was only entitled to reimbursement for payments to Mr. Tung "...until the entire $814,000 debt [was] extinguished...", Exhibit C, § 1.2 *infra*.

## II.     JURISDICTION AND VENUE

10.     Federal Question Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, in that this is an action "...arising under the [securities] laws....of the United States...".

11.     This Court has concurrent jurisdiction in cases involving offenses and violations of the provisions of the 1933 Securities Act, 15 U.S.C. § 77v(a) and exclusive jurisdiction in cases involving offenses and violations of the 1934 Securities Exchange Act, 15 U.S.C. 78aa(a).

12.     This Court has Diversity Jurisdiction pursuant to 28 U.S.C. § 1332, in that there exists full diversity between plaintiff and all defendants, *infra*.

13.     This Court has Supplemental Jurisdiction pursuant to 28 U.S.C. § 1367, in that state-law claims arising out of the subject facts are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.    This Court has Nationwide Personal Jurisdiction pursuant to Section 22(a) of the 1933 Securities Act, which allows suits in the district wherein the defendant is found or is an inhabitant or transacts business, a venue concept liberally construed in cases involving a federal question.

15.    Venue is proper in the District of Columbia because all defendants are regulated by the SEC and/or FINRA and have sufficient contacts with this forum to support jurisdiction _and_ venue.

16.    There exists no other venue more convenient than the District of Columbia or with greater access to witnesses, documents and relevant evidence available from the SEC and FINRA, both charged with the protection of the public interest in the investment world[4].

### III.   PARTIES

17.    CDII is a Florida-based company with international contacts in China and the Americas, missioned to assist businesses throughout the globe in participating directly in the rapid growth of emerging markets in China, the United States, Mexico, Peru, Bolivia, Chile and Equador.

18.    Rockwell is a Delaware corporation which publicly presents itself as a "...financial and business partner to emerging companies..." and is in the business of financing penny-stock companies unable to find conventional financing.

---

[4]    See, Leroy v. Great Western United, 443 U.S. 173, 185 (1979), holding that a plaintiff may choose a venue "...with approximately equal plausibility --- in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of defendant (but not the plaintiff)..."

19.    Alpine Securities Corporation ("Alpine"), located in Salt Lake City, Utah, is a self-clearing brokerage firm which presents itself as a "...boutique investment company..." and is allegedly a member of FINRA and the Securities Investor Protection Corporation ("SIPC"), both headquartered in Washington, D.C.

20.    Colonial Stock Transfer Company, Inc. ("Colonial") is a stock transfer company registered with the SEC as a bonded agent headquartered in Salt Lake City, Utah.

21.    Matheau J. W. Stout ("Stout") is *the* attorney who issued twenty-three (23) Rule 144 opinion letters which disregarded reasons why CDII shares should *not* have been released to Rockwell as "...unrestricted..." and sold by Rockwell immediately after all conversions.

22.    Samuel Oshana ("Oshana") is a citizen of the State of Connecticut, who at all pertinent times acted on behalf of Rockwell in carrying out a scheme to liquidate CDII common stock at death-spiral prices and was a Controlling Person and Affiliate as defined by C.F.R. 230.405[5]

## IV.    FACTUAL BACKGROUND

23.    On April 7, 2014, CDII borrowed $600,000 from a private lender, Kong Tung ("Mr. Tung"), at an interest rate of 2% per month, payable January 7, 2015 and secured by CDII assets ("the Original Note"), Exhibit A.

---

[5]    Q.V. "Controlling" Securities Fraud: Proposed Liability Standards for Controlling Persons Under the 1933 and 1934 Securities Acts, 72 Minn. L. Rev. 930 (1987-1988), at 931, n 7:

> "Although Congress did not define a controlling person, the courts generally consider any person who has control or influence over another to be in a controlling position."

24.    On January 7, 2015, Mr. Tung and CDII entered into an agreement amending the Original Note by extending the maturity date to December 31, 2015, and by providing that, after maturity, Mr. Tung had the option to convert the debt to CDII Common Stock at 85% of the market price of said stock on the date of conversion, with a conversion floor price of $ 0.001, limited to 9.99% of the outstanding shares at any given conversion time ("the Tung Loan Extension"), Exhibit B.

25.    At all pertinent times, Dr. James Wang ("Dr. Wang") personally guaranteed CDII's full and faithful performance of the Original Note and the Tung Loan Extension, entitling him to all rights and privileges generally available to guarantors, including fundamental subrogation rights.

26.    In mid-July, 2015, Mr. Tung, faced with cash-flow problems of his own, requested (not demanded) that CDII take steps to have the obligation liquidated by either paying the amount due or by selling the note to a lender acquainted with the considerable market for penny-stock company financing.

27.    By mid-September, Oshana was introduced (telephonically) to Dr. Wang and it was agreed that CDII would assign the Original Note to Rockwell in consideration of direct payments by Rockwell to Mr. Tung over a stated period of time.

28.    During discussions between Dr. Wang and Oshana (the only person to have acted on behalf of Rockwell) it was clearly understood that Rockwell could _not_ liquidate CDII shares without _first_ seeking reimbursement, giving CDII the option to meet Rockwell's call as opposed to having Rockwell engage in reckless "forced sales" of CDII common stock[6].

---

[6]     See discussion on the _Forced Sale Doctrine_, footnote 14, _infra_.

29.     On September 29, 2015, Mr. Tung assigned the Original Note to Rockwell based on Rockwell's agreement to pay Mr. Tung $107,000 upon closing and to make payments of no more than $100,000 every 45 days until the debt was fully extinguished ("the Tung-Rockwell Assignment"), Exhibit C.

30.     Also on September 29, 2015, CDII executed an "Amended and Restated Convertible Promissory Note" to Rockwell with a face value of $814,000,  accruing interest at 8% per annum  ("the Convertible Note"), Exhibit D.

31.     The  Convertible Note, however, contained significantly more onerous terms as to CDII should CDII not respond to a notice by Rockwell for reimbursement of any given payment to Mr. Tung, the *only* "triggering" mechanism for commencing the conversion process, to-wit:

> ❑     The Maturity Date was changed from December 31, 2015 to "ON DEMAND", ¶3;

> ❑     The  Convertible  Note's "Default  Conversion Rights" increased the level of the discount from market price from 15% to 40%, ¶4(a);

> ❑     The computation of the Conversion Price went from the price on the date of conversion to "...the lowest closing price of the common stock during the ten (10) day period preceding the conversion date, inclusive of the conversion date...", ¶4(a);

> ❑     By totally eliminating the conversion floor price of $0.01 as set forth at ¶ C in the January 7, 2015 Amendment, Exhibit B, Rockwell paid far less than par and as low as .00078, a separate violation of public policy and a breach of the respective agreements between all parties;

❑ The Convertible Note added obligations not included in the Original Note or in the Tung Loan Extension: delivery of shares without restrictions, payment of attorney's fees and waiver of all traditional defenses, including presentment, notice of dishonor and protest, ¶9.

32.   Relying on Oshana's representations in mid-September, 2015, Dr. Wang executed the Convertible Note on September 29, 2015.

33.   Rockwell did _not_ pay Mr. Tung the initial $107,000 until October 20, 2015, meaning that Rockwell was limited to payments "....up to $100,000..." every 45 days, commencing October 20, 2015.

34.   Since Rockwell _never_ called upon CDII to reimburse, there was _never_ a triggering of the conversion rights Rockwell unilaterally and illegally exercised.

### V.   NUDUM PACTUM

35.   A _Nudum Pactum_, an empty promise, a nude or naked pact, is _unenforceable_ for lack of consideration and is an absolute nullity (civil law) and void (common law) without consideration of any other factors[7].

36.   As to the September 29, 2015, Tung-Rockwell Assignment and the Convertible Note, CDII and Dr. Wang _remained_ liable to Mr. Tung and therefore Dr. Wang received no consideration for the detrimental provisions contained in the Convertible Note.

37.   Pretermitting the fact that Rockwell breached its obligations pursuant to the Convertible Note, prepared by Rockwell and presented to Dr.

---

[7]   The Latin phrase _ex nudo pacto non oritur actio_ means "...out of a nude or naked contract no action arises...", Black's Law Dictionary, 5th Edition.

Wang as a contract of adhesion[8], the Convertible Note was a *nudum pactum* unenforceable on its face for lack of mutual consideration.

38.    Given the toxic provisions contained in Section 4 of the Convertible Note (a classic "death-spiral") the court should declare the Convertible Note *sub judice* as unenforceable pursuant to public policy principles advanced by SEC Rule 144, FINRA Regulatory Notice 09-05 and FINRA Rule 2010, Exhibit E[9].

## VI.   *EX TURPI CAUSA*[10]

39.    On October 28, Rockwell prepared an "...instruction letter...", Exhibit F, presented it to Dr. Wang as a matter of adhesion, containing terms which would circumvent SEC Rule 144, to-wit:

❏    The instructions to convert "...without any further action or confirmation from the Company..." eliminated CDII's right to reimburse Rockwell for payments made to Mr. Tung;

❏    The instructions gave Rockwell unbridled rights (i) to create a large "reserve" of common stock, (ii) to unilaterally increase the reserve

---

[8]    By September 29, 2015, when he first saw the Convertible Note, Dr. Wang had no bargaining power and had to "...adhere..." to the terms, take it or leave it.

[9]    http//www.finra.org/About Finra:

"Our independent regulation plays a critical role in America's financial system --- by enforcing high ethical standards, bringing the necessary resources and experience to regulators and enhancing investor safeguards and market integrity..."

[10]    See, The Rights of Parties to Illegal Transactions, Neil Thompson, The Federation Press 1991, Chapter 3: *The Ambit of the Ex Turpi Causa Principle*.

and (iii) to order Colonial to reverse-split the common shares at its sole discretion;

❏ The instruction to Colonial to issue converted shares "...without any restrictive legend..." essentially ordered Colonial to "...look the other way..." in violation of Rule 144;

❏ The instruction that *any* representation letter signed by Rockwell "...would be sufficient..." as to affiliate status and removal of restrictions ordered Colonial to accept Rockwell's *ipse dixit* statements without objective examination; and

❏ The instruction to "...act immediately, without delay and without the need for any action or confirmation from the Company..." eliminated any incentive on the part of Colonial to faithfully adhere to its role as gatekeeper pursuant to Section 5 of the Act.

40.    At least the following aspects of SEC Rule 144 were circumvented by the  October 28, 2015, Instruction Letter from Rockwell to Colonial:

❏ By "tacking" the date of the Original Note, the Rule 144(d) Holding Period was circumvented and the holding period was materially misrepresented;

❏ By any measure, Rockwell's conversions violated the Volume Limitation of Rule 144(c) as to the amount of securities sold in any 3-month period; and

❏ By representing that all shares were held since April 7, 2014, (the date of the Original Note) Rockwell masked issues regarding affiliate and statutory underwriter status.

41.     As to *all* conversions, a "form" Rule 144 Seller's Representation Letter was sent to Colonial by Oshana, e.g. <u>Exhibit G</u>, claiming that he was a non-affiliate and that Rockwell was the "...Current Shareholder and Seller of securities..." for:

"...◙    ONE YEAR OR MORE..."

42.     The industry-wide *pattern* (i) of finding a desperate penny-stock company, (ii) of providing the company with "death-spiral" funding, (iii) of requiring the borrower to make the conversion rights "irrevocable", (iv) of requiring a large reserve to accommodate anticipated conversion, (v) of sending a transfer agent instructions to issue shares as unrestricted, and (vi) of providing blanket indemnity to any transfer agent is a cancer to the market and an open door to "pump and dump" schemes and naked short selling by hedge funds and market-makers in violation of Regulation SHO and the 1933 and 1934 acts.

### VII.    REFUSAL TO CEASE AND DESIST

43.     On December 7, 2015, CDII counsel James D. Sallah ("Sallah") sent a letter demanding that Rockwell "...*Cease and Desist Liquidation of CDII Common Stock...*", focusing on Rockwell's circumventing regulations as to registration and statutory underwriter status in a manifest "...scheme to evade the registration requirements of Section 5 [of the 1933 Act]..." ("the Cease and Desist Letter"), <u>Exhibit H</u>.

44.     The Cease and Desist Letter -- copied to Alpine and Colonial -- also focused on Rockwell's failure to aggregate sales, resulting in the mercurial liquidation of over 44% of CDII's common stock by December 15.

45. On December 8, 2015, Alpine responded to Sallah, alleging that it had undertaken independent due diligence and had determined that the shares were converted "...with the knowledge and consent of the issuer..." Exhibit I.

46. CDII avers that Alpine's "...due diligence..." was superficial at best and constituted a reckless disregard for the truth in violation of § 17 of the 1933 Act, 15 U.S.C. 77q(a), § 10(b) of the 1934 Act, 15 U.S.C. 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, for at least the following indisputable reasons:

    ❑    The Convertible Note was void on its face for failure of _any_ consideration in favor of CDII and for the inclusion of severe detriments set forth in ¶ 31, _supra_;

    ❑    The slightest due diligence would have exposed Rockwell's breach of the notice obligations as set forth in ¶4 of the Convertible Note and Rockwell's _never_ notifying CDII of its rampant conversions;

    ❑    All Rule 144 letters falsely stated that Rockwell held the shares to be converted for "...one year or more...", an egregious misrepresentation;

    ❑    The entire transaction was a scheme to defraud CDII by the illusion of an 8% loan which was intended to reap millions of windfall dollars through an unconscionable formula typical of death-spiral instruments.

47. On December 8, 2015, Rockwell counsel Matheau Stout ("Stout"), author of 23 Rule 144 Letters, rejected the proposition that the conversions violated § 5 of the 1933 Act, making 23 _verbatim_ misrepresentations that

Rockwell held the shares for more than one year, <u>Exhibit J</u>[11].

48.     On December 10, 2015, Sallah cited FINRA's Regulatory Notice 09-05 to remind Colonial of its responsibility to police transactions in situations where "...the surrounding circumstances place [a] firm on notice that it may be participating in illegal, unregistered resales of restricted securities...", ("FINRA Reg. 09-05"), <u>Exhibit L</u>[12].

49.     Sallah's December 10, 2015 letter also cited FINRA's enforcement order in *Department of Enforcement v. Aegis Capital Corporation* and Regulatory Notice 09-05, <u>Exhibit M</u>.

### VIII.   CONTROLLING PRINCIPLES OF THE SECURITIES LAWS

Against the factual backdrop of the underlying case, the following principles of the Securities Laws were violated by the defendants, willfully and in a reckless disregard for the truth:

> [50] Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder...or the performance of which involves the violation of ....any provision of this chapter or any rule or regulation

---

[11]     An example of Stout's Rule 144 Letters, always using the same *verbatim* terms, with changes only to describe different numbers of shares, is made <u>Exhibit K.</u>

[12]     The importance of a FINRA firm's compliance with its gatekeeper role is set forth thus:

> "FINRA reminds firms of their responsibilities to ensure that they comply with the federal securities laws and FINRA rules when participating in unregistered resales of restricted securities. *These responsibilities are particularly important in situations where the surrounding circumstances place the firm on notice that it may be participating in illegal, unregistered resales of restricted securities...*"

thereunder, *shall be void*.[13].

[51] Rule 10b-5 requires that three basic elements be pleaded and proved: (1) conduct by the defendants proscribed by the rule; (2) a purchase or sale of securities by plaintiffs '...in connection with...' such proscribed conduct; and (3) resultant damages to the plaintiffs[14].

[52] A securities fraud claim under Section 10(b) requires proof that the defendant (1) made misstatements or omissions of material fact; (2) with *scienter*; (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied; and (5) that plaintiff's reliance was the proximate cause of their injury[15].

[53] *Scienter*, or the intent to deceive, manipulate or defraud can be established either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness[16].

---

[13]    Section 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b).

[14]    See, Alley v. Miramon, 614 F.2d 1372 (5th Cir. 1980) n.10.

The application of a "forced seller" rule avoids the more difficult intellectual analysis as to options, puts and calls qualifying, as in Pittsburgh Terminal Corporation v. Baltimore & Ohio RR, 680 F.2d 933 (3rd Cir. 1982), regarding the industry-wide *pattern* of using death-spiral instruments to destroy penny-stock companies and thereby gain vulgar profits at the cost of common stock shareholders.

[15]    Weiner v. Quaker Oats Co., 129 F.3d 310 (3rd Cir.1997).

[16]    Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

[54] It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --- (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors[17].

[55] In the context of the failure to state a material fact, Rule 10b-5 makes it unlawful for a defendant to have made "...any untrue statement  of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...[18]

[56] Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or the cause of action[19].

[57] Section 13(d) of the 1934 Act imposes limits on beneficial ownership by providing that a company "...shall not  effect any conversion of Preferred Shares and no holder of Preferred Shares shall have the right to convert

---

[17]    15 U.S.C.  § 78j(b).

[18]    17 C.F.R.  § 240.10b-5..

[19]    15 U.S.C.  § 78t(a).

Preferred Shares in excess of that number of Preferred Shares which, upon giving effect to such conversion, would cause the aggregate number of shares of Common Stock beneficially owned by the holder and its affiliates to exceed 4.99% of the total outstanding shares of Common Stock following such conversion[20].

[58] Pursuant to Sections 5(a) and 5(c) of the 1933 Securities Act, a broker-dealer must conduct *a reasonable inquiry*, and after such inquiry, it must not be "...aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is part of a distribution of the securities of the issuer..." (As to what constitutes "...a reasonable inquiry...", see *Distribution by Broker-Dealers of Unregistered Securities,* Securities Act Release No. 33-4445).[21]

[59] Rule 144, 17 C.F.R. § 230.144(c) and (d) provides a non-exclusive safe harbor for individuals or entities to sell restricted shares or affiliate-owned shares without being deemed to be a statutory underwriter and therefore qualify for Securities Act Section 4(a)(1)'s exemption from registration for "transactions by any person other than an issuer, underwriter or dealer." to qualify for the safe harbor, the resale must meet two conditions: the individual or entity must hold the shares of a non-reporting issuer for at least a year prior to reselling them and there must be adequate public information available.

[60] In the face of recurring and manifest "red flags" suggesting that customers are engaging in unregistered distribution of securities, brokers cannot satisfy their

---

[20]   15 U.S.C. § 78m(d).

[21]   15 U.S.C. § 77d(a)(4); 17 C.F.R. § 230.144(g)(4).

"...reasonable inquiry..." obligations by relying on the mere representations of their customers, the issuers, or counsel for same, without investigating the potential for opposing facts[22].

[61]  A broker may reasonably rely on an attorney opinion *only* where: (1) that opinion letter describes the relevant facts in sufficient detail to provide an *explicit* basis for the legal conclusions stated, (2) the broker's reasonable independent investigation does not uncover contrary facts and (3) the attorney opinion letters are not based on conclusory representations (*ipse dixits*) by the issuers and/or the customer[23].

### IX.   COMPLIANCE WITH PSLRA

62.   In order to comply with the heightened pleading requirements imposed on plaintiffs by the Private Securities Litigation Reform Act of 1995, Pub.L. 104-67, 109 Stat.737 ("PSLRA"), CDII articulates as to each defendant the factual bases for their independent liability under the applicable securities laws.

---

[22]   See, World Trade Financial Corp. v. SEC, 739 F.3d 1243, 1249 (9th Cir. 2014). See also, *Transactions in Securities of Laser Arms Corporation by Certain Broker-Dealers,* Exchange Act Release No. 34-28878 13 (Feb. 14, 1991).

[23]   ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER, *In the Matter of Oppenheimer & Co., Inc.,* Release No. 9711, January 27, 2015.

63. As to Rockwell, which at all pertinent times was "controlled" by Oshana as envisioned by Section 20(a) of the 1934 Act, Rockwell violated the securities laws in at least the following ways and means:

❏ When Oshana first communicated with Dr. Wang mid-September, 2015, Oshana agreed to lend CDII the $600,000 plus accrued interest needed to pay Mr. Tung on the basis of a loan at 8%;

❏ In making the commitment to advance funding, Oshana told Dr. Wang that he would be preparing a Convertible Note, but that no conversions could take place unless and until Rockwell (i) made a payment to Mr. Tung, (ii) then made a demand upon CDII for reimbursement and (iii) CDII failed to meet the demand for reimbursement;

❏ Oshana _omitted_ to inform Dr. Wang, however, that he intended to convert CDII common stock under the death-spiral formula _without_ complying with any of the notice provisions in the note[24];

❏ Oshana _also omitted_ to inform Dr. Wang that he intended to convert CDII common stock beyond the amount necessary to pay the Tung indebtedness, _notwithstanding_ the provision at Section 2.1 of the assignment, closing the door when "...the entire $814,000 debt [would be] extinguished...";

❏ Oshana _also omitted_ to inform Dr. Wang that he (Oshana) was the target of SEC allegations of Section 3(a)(10) abuses through schemes similar to his

---

[24]  The 8% interest rate Rockwell would receive for advancing the funds was an illusion and a "bait-and-switch" provision never intended to be _the_ return on the loan advanced, a typical deception practiced by sellers of toxic convertibles in the penny-stock marketplace.

dealings with CDII[25];

❑     Oshana *also omitted* to inform Dr. Wang that he
        intended to use *one* lawyer to provide all Section
        3(a)(1) opinion letters and that the same lawyer
        (Stout) would obediently instruct Colonial not to
        make the "...reasonable inquiry..." required by law.

64.    In making all misrepresentations and in omitting to state
material facts necessary to make his statements not misleading, Oshana
utilized instrumentalities of interstate commerce including but not limited
to telephone lines and systems, government and private mail and carrier
services, banking facilities and national exchange facilities and services.

65.    Had Dr. Wang known that Oshana was not, in fact, willing to lend
the money at issue for a return of the cited 8% interest rate, and that Oshana
intended to convert CDII shares at death-spiral conversion rates,, and to do
so without notice to CDII, and in breach of the agreements culminating in the
September 29, 2015 documents, he would not have proceeded with the
transactions.

---

[25]     See, *Ironridge Hits Back at SEC Action on Section 3(a)(10) Deals*, Growth
Capital Advisor, July 21, 2015, at 2, *viz*:

> "Hints of regulatory issues with 3(a)(10) deals were first
> seen last November, when the SEC brought enforcement
> actions against 10 issuers for lack of disclosure about
> 3(a)(10) financing....All of the companies had closed 3(a)(10)
> financing by IBC Funds, LLC, managed by **Samuel
> Oshana** and Bryan Collins....*who used one South Florida
> Judge primarily to approve their 3(a)(10) deals*.
>
> The duo uses the names **IBC Holdings, IBC Funds and
> IBC Equity**..."

66.    Had Dr. Wang known that Oshana did not intend to stop making conversions when the entire debt to Mr. Tung was extinguished, and that all defendants would aid and abet Rockwell in carrying out a premeditated scheme to defraud CDII by converting its shares and unjustly enriching Rockwell and others by millions of dollars, he would not have proceeded with the transactions.

67.    Had Dr. Wang known that in November of 2014, the SEC had brought enforcement actions against 10 "...issuers..." for securities violations involving Section 3(a)(10) and for circumventing Rule 144 requirements *and* that all ten companies (issuers) had closed the questioned deals with IBC Funds, LLC, managed by Oshana, he would not have proceeded with the transactions.

68.    Had Dr. Wang known that Stout, Alpine and Colonial would fail, individually and collectively, to satisfy their respective "...gatekeeper..." roles as intended by Congress in passing the various securities laws, and that Stout, Alpine and Colonial would sit idly by while Rockwell and Oshana violated the securities laws and would rely blindly on Oshana's written and self-serving *ipse dixits*, he would not have proceeded with the transactions.

## X.   SCIENTER

69.    The PSLRA also requires a 10b-5 plaitiff to plead a "...strong inference..." of *scienter*, 15 U.S.C. § 78u-4(b)(2), which in the case at bar is amply supplied by the following irresistible inferences flowing naturally from the actions and inactions of Oshana and the other defendants, to-wit:

❏ The total failure on the part of Rockwell to meet its notice obligations under Section 4(b) of the Convertible Note raises the *irresistible inference* that Oshana never intended to stop converting when the $814,000 debt was extinguished;

❏ The total failure on the part of Rockwell to give CDII notice to reimburse Rockwell whenever a payment was made to Mr. Tung raises the *irresistible inference* that Oshana never intended to stop converting when the $814,000 debt was extinguished and thereby limit Rockwell's recovery to 8% of the money loaned;

❏ The total and rank refusal by Rockwell to "...cease and desist..." when CDII counsel Sallah so demanded on December 7, 2015, raises the *irresistible inference* that the defendants all made the conscious decision to disobey the securities laws and see if Dr. Wang would fight for his rights, something few victims are able to do;

❏ The parallel manner in which the defendants played their respective roles, ignoring the many "red flags" FINRA has identified raises the *irresistible inference* that this was all a scheme to circumvent the registration requirements of Section 5 of the 1934 Act, as stated by CDII counsel Sallah in his December 10 Cease and Desist letter:

> "...Alpine's failure to aggregate in accordance with FINRA's position could be viewed as aiding and abetting a scheme to circumvent the registration requirements of Section 5, along with other violations of FINHA rules..."

70.     As to defendant Stout, he simply ". . . .looked the other way. . . ." in order to circumvent Rule 144 (d) as to the *Holding Period*, Rule 144(e) as to *Volume Limitations*, Rule 144(f) and Rule 144(g) as to the *Manner-of-Sales*, Rule 144(f) and Rule 144(g) and the *Manner-of-Sale Requirements* and Rule 144(h) as to the *Notice of Sale Requirements*.

71.     In failing to reasonably respond to Sallah's demands that Rockwell cease-and-desist conversions, Stout enabled all defendants to commit joint and several violations of the securities laws with the comfort that they were all acting "...on the advice of counsel..." or in reasonable reliance on Stout's veiled opinion letters.

72.     CDII further avers that Stout's instruction letter to Colonial was a veritable cover-up symbolic of industry patterns as follows:

❑     By the use of the word "irrevocally", Stout eliminated CDII's right to slow the process of staccato conversions and hopefully eliminate the irreparable damage to the diluted shares and the rights of the shareholders;

❑     By referring to the requested speed for all transactions as a "...material obligation pursuant to the settlement...", Stout created an artificial contract right that did not exist;

❑     By irrevocably instructing Colonial to issue the shares "...without any restrictive legend...", Stout essentially instructed Colonial to break the law and ignore its gatekeeper obligations in the most important aspect of Rule 144: the holding period;

❑     By providing for a *unilateral* right to increase the reserve, Stout was preparing Colonial for the greatest level of fraud in the world of death-spirals:

### *CONVERSIONS WITH NO FLOOR[26]*

❑ By instructing Colonial to issues unrestricted shares upon the mere delivery of "...an opinion of counsel for the Investor..." Stout instructed Colonial to ignore the possibility that the provisions of Rule 144 were being violated and not to look;

❑ By instructing Colonial to blindly accept confirmation by a representation letter from Rockwell Capital Partners stating that "...the shares issued will keep Rockwell Capital Partners' ownership below 4.99% and no other confirmation will be necessary...", Stout elevated Rockwell's self-serving *ipse dixits* to dogma, mocking Congressional intent that these transaction be policed by transfer agents and many others;

❑ By giving Colonial indemnity, the veritable "fix" was completed and CDII was left with no SRO protection or any recourse but to bring this action.

### *XI. COUNT ONE*
### *NULLITY OF THE SEPTEMBER 29, 2015 CONVERTIBLE NOTE*

73. Pursuant to the provisions of 28 U.S.C. § 2201, CDII requests that this Honorable Court declare the September 29, 2015 Convertible Note an absolute nullity for failure of consideration, fraud in the inducement and other deficits rendering the note a *nudum pactum*, unenforceable on its face and as applied.

74. Alternatively, CDII requests that the court declare the note a nullity unenforceable as a consequence of its violation of public policy.

---

[26] The strongest inference of *scienter* comes from the compelling evidence that Oshana and Rockwell were "...planning ahead..." for the unconscionable conversions at issue.

## XII.   COUNT TWO
## NULLITY OF OCTOBER 2015 INSTRUCTION LETTER

75.   Pursuant to the provisions of 28 U.S.C. § 2201, CDII requests that this Honorable Court declare the October 2015 Instruction Letter from Stout to Colonial an absolute nullity as part of a pattern of conduct that is unenforceable as against public policy, *ex turpi causa*.

## XIII.   COUNT THREE
## DAMAGES FOR BREACH OF CONTRACT

76.   Pursuant to the provisions of 28 U.S.C. § 2202, CDII requests further relief in the form of damages for breach of contract against Rockwell arising out of all conversions made without giving CDII notice, in violation of all common, civil and statutory laws violated, and for punitive damages as law and equity may allow.

## XIV.   COUNT FOUR
## DAMAGES FOR WRONGFUL CONVERSION OF SHARES

77.   Pursuant to the provisions of 28 U.S.C. § 2202 and in the exercise of this Court's § 1367 Supplemental Jurisdiction, CDII requests further relief in the form of damages for the wrongful conversion of CDII shares in violation of all common, civil and statutory laws violated, and for punitive damages as law and equity may allow.

## XV.   COUNT FIVE
## DAMAGES FOR VIOLATIONS OF 1933 AND 1934 SECURITIES ACTS

78.   Pursuant to the provisions of 28 U.S.C. § 2202 and in the exercise of this Court's § 1331 Federal Question Jurisdiction, CDII requests further relief in the form of damages for violations of the 1933 and 1934 Securities Acts and all rules promulated thereafter.

## XVI. COUNT SIX
## EQUITABLE RELIEF AND TRIAL BY JURY

79.    CDII prays for such additional relief as equity may afford.

80.    CDII is entitled to and prays for a trial by jury on all matters at
law.

Respectfully submitted,


s/   *Henry L. Klein*
Henry L. Klein (DC Bar LA0003)
844 Baronne Street
New Orleans, Louisiana 70113
(504) 301-3027
henryklein44@gmail.com


Summons to:

ROCKWELL CAPITAL PARTNERS, INC.
919 N. Market Street, suite 1401
Wilmington DE 19801

ALPINE SECURITIES CORPORATION
39 Exchange Place
Salt Lake City, UT 84111

COLONIAL STOCK TRANSFER COMPANY, INC.
66 Exchange Place, Suite 100
Salt Lake City, UT 84111

MATHEAU J. W. STOUT
400 East Pratt Street
Baltimore, MD 21202

SAMUEL OSHANA
520 Cognewaugh Road
Greenwich, CT 06807