UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CD INTERNATIONAL ENTERPRISES, INC.**, <br><br>Plaintiff, <br><br>v. <br><br>**ROCKWELL CAPITAL PARTNERS, INC.**, **et al.**, <br><br>Defendants. | Case No. 16-cv-00394 (CRC) |

## MEMORANDUM OPINION

Plaintiff CD International Enterprises, Inc. ("CDII") extended a promissory note to Defendant Rockwell Capital Partners, Inc. ("Rockwell") that included a provision giving Rockwell the right to convert CDII debt into shares of the company. After Rockwell exercised its conversion right and immediately began to sell its newly acquired stock, CDII's share price fell precipitously. In this suit against Rockwell and other involved parties, CDII complains that by liquidating its shares so quickly, Rockwell reaped outsized profits and drove CDII's stock price into a "death spiral." Perhaps so. But because Rockwell's actions were consistent with the parties' negotiated, written agreements, no cause of action lies. The Court will therefore dismiss CDII's Complaint.

**I.    Background**

The Complaint alleges the following facts: CDII is a Florida-based company that provides mineral-trading and consulting services to companies doing business in China and South America. Compl. ¶ 17. Its shares are traded on the over-the-counter market. See CD International Enterprises, Inc., OTC Markets (Apr. 11, 2017, 4:30 PM), http://www.otcmarkets.com/stock/CDII/quote. On April 14, 2014, CDII borrowed $600,000

from Kong Tung, a private lender, at an annual interest rate of 24%. Compl. ¶ 23. The supporting promissory note provided that the full amount and all accrued interest were to be repaid in full by January 7, 2015. Id., Ex. A ("Original Note"). When CDII failed to repay Mr. Tung by that date, the parties entered into a new agreement. Tung agreed to extend the loan's maturity date to December 31, 2015. In exchange, CDII provided Tung with the right to convert the debt into shares of CDII stock should CDII fail to repay the loan by the new maturity date. Id. at ¶ 24.

Prior to the new maturity date, however, Tung experienced "cash-flow problems" and requested that CDII either pay the amount early or find a third-party investor to purchase the note. Id. at ¶ 26. CDII agreed and found Rockwell. Id. at ¶ 29. Rockwell purchased the note on September 29, 2015. The agreement assigning the note provided that Rockwell would pay Tung $107,000 upon closing, and make payments every 45 days until the debt was extinguished. Id.; see also id., Ex. C ("Tung-Rockwell Assignment"). Separately, Rockwell and CDII amended the note to reduce the annual interest rate from 24% to 8%, to eliminate the December 31, 2015 maturity date and provide that payment was now due upon demand, and to allow Rockwell to convert the debt into CDII stock at any time. Id. at ¶¶ 31–32; see also, id., Ex. D ("Convertible Note"). CDII then sent a letter to its stock transfer agent, Defendant Colonial Stock Transfer Company, Inc. ("Colonial"), that instructed Colonial to reserve a sufficient amount of shares "for issuance upon [Rockwell's] full conversion" of the note. Id., Ex. F ("Instruction Letter").

Soon after executing the Convertible Note, Rockwell exercised its contractual right to convert the debt into shares of CDII stock. Id. at ¶ 6. The conversions occurred every few days over a period of two months. Id. at ¶¶ 6–7. After Colonial effectuated the conversions consistent with the Instruction Letter, Rockwell sold the stock using Defendant Alpine Securities

Corporation ("Alpine"), a brokerage firm, as an intermediary. Rockwell's sale of the stock resulted in a "precipitous drop" in the value of CDII's remaining shares. Id. at ¶ 2.

CDII filed suit in this Court on February 27, 2016, naming Rockwell, Colonial, Alpine, Rockwell's lawyer, Matheau Stout, and its President, Samuel Oshana, as defendants. CDII's Complaint alleges: (1) that the CDII-Rockwell Convertible Note is void for lack of consideration, fraud in the inducement, and "other deficits"; (2) that CDII's Instruction Letter to Colonial is unenforceable as against public policy; (3) that Rockwell violated the terms of the Convertible Note by failing to provide notice to CDII prior to exercising its conversion rights; and (4) that Rockwell wrongfully converted CDII shares.[1] Defendants have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), and have waived any defenses relating to personal jurisdiction and venue. See Notice Regarding Jurisdiction and Venue, 16-cv-394 (July 5, 2016) (ECF No. 40).

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive such a motion, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual conduct "allows the court to draw the reasonable inference that the defendant is liable for the misconduct." Iqbal, 556 U.S. at 678. While a court must accept the complaint's factual allegations as true and construe them liberally

---

[1] CDII's Complaint initially contained an allegation that Defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934. See Compl. ¶ 78. The Court granted CDII's motion to voluntarily dismiss this count without prejudice on July 19, 2016. See Order granting Pl.'s Mot. to Dismiss Count Five, 16-cv-964 (July 19, 2016) (ECF No. 44).

in favor of the plaintiff, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. Id. This pleading standard is heightened when the plaintiff alleges fraud. Under Federal Rule of Civil Procedure 9(b), the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In other words, "Rule 9(b) requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." Elemary v. Philipp Holzmann A.G., 533 F. Supp. 2d 116, 137 (D.D.C. 2008).

**III.   Discussion**

  A.  CDII's Claim that the Convertible Note is Void

  *1. Lack of Consideration*

CDII first argues that the Convertible Note it executed with Rockwell is void for lack of consideration.[2] "In determining whether a valid contract exists, [courts] will not inquire into the adequacy of consideration, even where it is arguably slight, as long as it is legally sufficient." Washington Inv. Partners of Delaware, LLC v. Sec. House, K.S.C.C., 28 A.3d 566, 574 (D.C. 2011) (internal quotations omitted). "An exchange of promises or a detriment to the promise constitutes legally sufficient consideration, 'so long as it is bargained for.'" Id. (quoting Pearsall

---

[2] The parties cite Nevada law in contesting these issues, presumably due to the choice-of-law clause in the Convertible Note. See Convertible Note ¶ 10 ("The laws of the State of Nevada shall be applicable for purposes of governing, construing and determining the validity of this Note and this transaction."). But CDII's lack-of-consideration argument goes to whether a contract was formed in the first place. "Applying [a contract's] choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." Selden v. Airbnb, Inc., 2016 WL 6476934, at *4 n.1 (D.D.C. Nov. 1, 2016) (quoting McMullen v. Synchrony Bank, 164 F. Supp. 3d 77, 87 (D.D.C. 2016)). As a result, the Court will instead assess the relevant choice-of-law rules to determine what state's law applies. Having done so, the Court will apply D.C. law.

4

v. Alexander, 572 A.2d 113, 118 (D.C. 1990) (citing Restatement (Second) of Contracts § 75 (Am. Law Inst. 1981)).

The Convertible Note is supported by legally sufficient consideration. In exchange for the right to convert the outstanding debt into CDII common stock, Rockwell agreed to (1) reduce the loan's annual interest rate from 24% to 8%; (2) eliminate the December 31, 2015 maturity date; and (3) reduce the scope of the assets CDII pledged as security for the loan. See Convertible Note ¶¶ 2–4. CDII's arguments that these benefits do not amount to valid consideration miss the mark. It concedes that the interest rate was lowered but asserts that "[t]he 8% was bait" because Rockwell was able to reap a significant profit from selling CDII's stock. Pl.'s Opp'n MTD 8. But while Rockwell may have gotten the better of the deal, "the requirement of consideration may be met despite great difference in the values exchanged." See Restatement (Second) of Contracts § 79 cmt. e (Am Law Inst. 1981). Next, CDII insists that the elimination of the December 31, 2015 maturity date is invalid consideration because Rockwell allegedly did not make payments to Tung before exercising its conversion rights. Pl.'s Opp'n MTD 9; see also Convertible Note § 4 (providing no such restrictions on Rockwell's conversion rights). CDII further argues that the reduction in the scope of assets pledged as security is invalid consideration because "Rockwell never 'loaned' CDII any money." Id. at 9. These arguments, however, are irrelevant to the consideration analysis as the elimination of the maturity date and the reduction in pledged assets for security are still "bargained for" benefits that CDII received. Thus, while CDII may regret the deal it struck with Rockwell, the Court finds that it is supported by legally sufficient consideration.

## 2. Fraud in the Inducement

CDII next argues that the Convertible Note is void because Rockwell fraudulently induced CDII into the agreement. CDII alleges that it relied upon Rockwell's representation that it would not "liquidate CDII shares without first seeking reimbursement, giving CDII the option to meet Rockwell's call." Compl. ¶ 28. CDII alleges that Rockwell made this representation during negotiations in September 2015. Id. at ¶ 32. The final agreement between the parties, however, contained no such restriction on Rockwell's conversion rights and expressly noted that "[n]o other terms or oral promises not contained in this written contract may be legally enforced." See Convertible Note 2.

To establish fraud in the inducement under Nevada law,[3] a plaintiff must show that its reliance on an intentionally false representation is justifiable. See JA Jones Const. Co. v. Lehrer McGovern Bovis, Inc., 89 P.3d 1009, 1018 (Nev. 2004). But a plaintiff is barred from claiming to have justifiably relied on representations that were made during negotiations and do no not appear in the final, fully integrated contract. See Montes v. Bank of America, NA, 2014 WL 1494234, *11 (D. Nev. Apr. 15, 2014) (applying Nevada law and holding that reliance on such representations "is not justifiable as a matter of law"). Here, CDII does not allege that Rockwell fraudulently removed certain terms from the agreement and then tricked CDII into signing it. Rather, CDII claims only that it relied on statements made during negotiations. Under applicable

---

[3] Because fraud in the inducement "renders [a contract] voidable but not void," Langley v. FDIC, 484 U.S. 86, 94 (1987), the Court will apply Nevada law in assessing this claim, pursuant to the Convertible Note's choice-of-law provision. See Restatement (Second) of Contracts § 201 cmt. c (Am. Law 1971) ("The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision.").

6

case law, this alleged reliance was not justifiable. Moreover, any reliance that CDII placed on representations that were plainly not included in the agreement was especially unwarranted given that CDII is (presumably) a reasonably sophisticated international business. See <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 105 (2d Cir. 2007) (noting that, in the context of a claim under the Securities Exchange Act of 1934, "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation"). The Court will therefore dismiss CDII's fraudulent inducement claim.

　　　　3. *Public Policy*

CDII also argues that the Convertible Note is void as a violation of public policy. A "convertible security" is one security that can be converted into another. See Convertible Securities, U.S. Securities and Exchange Commission (Aug. 10, 2012), *available at* https://www.sec.gov/fast-answers/answersconvertibleshtm.html. Typically, a convertible security is a bond or a preferred stock that can be converted into a company's common stock. <u>Id.</u> Conventional convertible securities convert into common stock based on a fixed price, or contain other provisions to preserve the value of the company's remaining shares upon conversion. <u>Id.</u> Less common are convertible securities like the Convertible Note in this case, which are based on fluctuating market prices and "can lead to dramatic stock price reductions and corresponding negative effects on both the company and its shareholders." <u>Id.</u> It is this latter type of convertible security—which has colloquially been referred to as a "floorless," "toxic," "death spiral," and "ratchet" security—that CDII argues violates public policy. <u>Id.</u>

"It is accepted law that '[a] promise or other term of an agreement is unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the

case law, this alleged reliance was not justifiable. Moreover, any reliance that CDII placed on representations that were plainly not included in the agreement was especially unwarranted given that CDII is (presumably) a reasonably sophisticated international business. See <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 105 (2d Cir. 2007) (noting that, in the context of a claim under the Securities Exchange Act of 1934, "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation"). The Court will therefore dismiss CDII's fraudulent inducement claim.

　　　　3. *Public Policy*

CDII also argues that the Convertible Note is void as a violation of public policy. A "convertible security" is one security that can be converted into another. See Convertible Securities, U.S. Securities and Exchange Commission (Aug. 10, 2012), *available at* https://www.sec.gov/fast-answers/answersconvertibleshtm.html. Typically, a convertible security is a bond or a preferred stock that can be converted into a company's common stock. <u>Id.</u> Conventional convertible securities convert into common stock based on a fixed price, or contain other provisions to preserve the value of the company's remaining shares upon conversion. <u>Id.</u> Less common are convertible securities like the Convertible Note in this case, which are based on fluctuating market prices and "can lead to dramatic stock price reductions and corresponding negative effects on both the company and its shareholders." <u>Id.</u> It is this latter type of convertible security—which has colloquially been referred to as a "floorless," "toxic," "death spiral," and "ratchet" security—that CDII argues violates public policy. <u>Id.</u>

"It is accepted law that '[a] promise or other term of an agreement is unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the

circumstances by a public policy against the enforcement of such terms.'" Jacobsen v. Oliver, 555 F. Supp. 2d 72, 79 (D.D.C. 2008) (quoting Restatement (Second) Of Contracts § 178 (Am. Law Inst. 1981)). Here, the terms of the Convertible Note appear to have enabled Rockwell to profit at the expense of CDII's other shareholders. And that might well have been Rockwell's goal from the outset. Yet, as the Second Circuit has observed, "purchasing a floorless convertible security is not, by itself or when coupled with short selling, inherently manipulative," insofar as "[s]uch securities provide distressed companies with access to much needed capital." ATSI Commc'ns, 493 F.3d at 101; see also Sharette v. Credit Suisse Intern., 127 F. Supp. 3d 60, 97 (S.D.N.Y. 2015) ("[F]loorless convertible securities are not illegal, inherently unreasonable, or outside the realm of the standards of ordinary care."). The Court therefore finds that the interest in enforcing the Convertible Note is not "clearly outweighed" by any countervailing public policy considerations, and will dismiss this claim.[4]

B. CDII's Remaining Claims

Count Three of the Complaint is a breach of contract claim. Specifically, CDII alleges that Rockwell exercised its conversion rights without first giving CDII notice, as required under the terms of the Convertible Note. See Compl. ¶ 76; Convertible Note § 4(b) ("[Rockwell] shall give written notice of any Default Conversion to [CDII] at [CDII's] address specified above."). Under Nevada Law, a plaintiff in a breach of contract action must show "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) *damage as a result of the breach*." Saini v.

---

[4] CDII argues in Count Two of the Complaint that the Instruction Letter it sent to its stock transfer agent Colonial is also void against public policy. See Compl. ¶ 75. In the Instruction Letter, CDII "irrevocably authorized and instructed" Colonial to reserve a sufficient number of shares of CDII common stock for issuance upon conversion pursuant to the terms of the Convertible Note. See Instruction Letter 1. The Court must dismiss this Count for failing to state a claim. The Instruction Letter is not a contract that can be voided for being against public policy.

Int'l Game Tech., 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (emphasis added) (citing Richardson v. Jones, 1 Nev. 405, 405 (Nev. 1865)).

Rockwell appears to admit that it did not provide notice directly to CDII, and instead contends that it notified CDII's stock transfer agent, Colonial. See Rockwell's MTD 24 n.10. Rockwell notified Colonial pursuant to a letter sent from CDII to Colonial directing Colonial to process any conversion requests from Rockwell "without any further action or confirmation by [CDII]." Instruction Letter 1. While Rockwell's failure to provide direct notice to CDII appears to be at odds with the plain language of the contract, Rockwell argues that the Court must nonetheless dismiss the breach of contract claim. After all, Rockwell contends, CDII has not alleged any damages as a result of the purported breach, nor could it. See Rockwell's MTD 24 n.10. CDII indeed fails to allege how it was (or could have plausibly been) damaged from not being directly notified in advance of the conversions it was contractually obligated, and expressly directed its transfer agent, to effectuate. CDII also failed to move for leave to amend its complaint to allege such facts. What is more, CDII had multiple opportunities to address this issue in subsequent filings with the Court and failed to do so,[5] and "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." Young Habliston v. Finra Regulation, Inc., 2017 WL 396580, at *4 (D.D.C. Jan. 27, 2017) (quoting Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002)). Because CDII did not respond to Rockwell's argument

---

[5] CDII filed an opposition to the Defendants' motions to dismiss, as well as a "Restated Opposition to Defendants 12(b)(6) Motions to Dismiss." See ECF Nos. 26, 45. In neither filing did CDII respond to Rockwell's argument that CDII failed to state a breach of contract claim.

9

that it failed to state a breach of contract claim, the Court finds that CDII conceded the issue. The Court will therefore dismiss Count Three for these two independent reasons.

Finally, in Count Four, CDII "requests further relief in the form of damages for the wrongful conversion of CDII shares in violation of all common, civil and statutory laws violated." Compl. ¶ 77. Neither the Complaint nor CDII's subsequent filings with the Court clarify whether Count Four is a claim for damages from what CDII alleges were wrongful stock conversions *or*, as Defendants seem to believe, whether it alleges a separate tort of "conversion." See Rockwell's MTD 25–26; Alpine's MTD 9–12. Under Nevada law, the tort of conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." Scaffidi v. United Nissan, 425 F. Supp. 2d 1159, 1168 (D. Nev. 2005) (citing Wantz v. Redfield, 326 P.2d 413, 414 (Nev. 1958)). "Moreover, an act, to be a conversion, must be essentially tortious; a conversion imports an unlawful act, or an act which cannot be justified or excused in law." Id. But regardless of whether CDII is alleging that Rockwell's conversions were unlawful or that the conversions themselves constitute a tort of "conversion," Count Four fails to state a claim because, as discussed previously, Rockwell's conversions of debt into common stock were consistent with the parties' written agreements. The Court must therefore dismiss Count Four.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Defendants' motions to dismiss, and will dismiss this suit in its entirety. A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: April 24, 2017